IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Philip Zapata,

                Plaintiff,                Case No. 3:13 CV 2203

   v.

                                              MEMORANDUM OPINION AND
                                              ORDER

URS Energy &
Construction, Inc., et al.,

                Defendants.

## INTRODUCTION

      Plaintiff Philip Zapata initiated this action against two corporate defendants, URS Energy & Construction, Inc. and BP Products North America Inc., and an individual, Corie Spurgeon, an employee of Defendant URS. Before me are Defendants' motions for summary judgment. (Doc. Nos. 40, 41). Zapata filed an opposition to both motions (Doc. No. 44) and Defendants replied (Doc. Nos. 46, 47). The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. For the reasons that follow, I find Defendants' motions well-taken.

## BACKGROUND

      Zapata is a trained journeyman boilermaker, and a member of Boilermakers Local Lodge No. 85 ("Local 85"). Typical for union boilermakers, Zapata has no fixed place of employment but works for a number of contractors, on a number of different jobs sites. He is generally referred to a contractor by Local 85, and the job assignment can range from several days to several months. Defendant URS is one of those contractors.

      Zapata began working on a turnaround maintenance project for URS at the BP Refinery in July 2012. URS and Local 85 entered into a collective bargaining agreement that governed the terms

and conditions of Zapata's employment. Zapata had no contract of employment with BP. Zapata was supervised on the jobsite by URS Safety Manager Corie Spurgeon and URS Manager Rick Wallace. BP's project manager for the turnaround maintenance project was Alan Clink. BP's Lead Safety Advisor at the time was Jim Feckley, and BP's Health, Safety, Security, and Environmental Manager was Thomas Brungard. Brungard also held the position of Ethics and Compliance Leader, and was responsible for monitoring and enforcing compliance with BP's code of conduct.

Zapata was scheduled to be laid-off October 7, 2012, as the maintenance project was ending. (Doc. No. 39 at 143). On the morning of his last day, Zapata drove a golf cart up to the maintenance shop to use the bathroom. (*Id.* at 140). When he came out, Spurgeon was "outside of there saying I was driving the golf cart like a maniac, had it on two wheels." (*Id.* at 140). Spurgeon also told him he was not allowed to use the maintenance bathroom and an argument ensued. Zapata accused Spurgeon of harassment and according to Zapata, she told him to "go through the proper channels." (*Id.* at 140). Spurgeon called Bo, another URS project manager, and asked him to come to the maintenance shop. According to Zapata, Bo told Spurgeon to "calm down" because there was "going to be a layoff" that day and she wouldn't "have to deal with it anymore." (*Id.* at 143).

Also on the morning of Zapata's last day, but separate and apart from the golf cart incident, Clink informed Wallace that one of BP's female safety employees, Stephanie Sedlak, complained that a URS boilermaker had harassed her that week on three separate occasions. (Doc. No. 35-1 at 5). Because of the number of contractors and employees on the BP jobsite, many people do not know each other's names. (Doc. No. 40-2 at 1). Indeed, prior to Zapata's eventual removal from the BP jobsite, he did not know any of the BP individuals involved in his termination for sexual harassment described below.

Sedlack made a statement describing the incidents of harassment. On the first occasion, Sedlak stated a URS boilermaker moved very close to her, invaded her personal space, and followed her when she tried to walk away. (Doc. No. 40-4). Sedlack also stated the harasser told her he was Marcos Requena's cousin. (*Id.*). Sedlak described the second occasion as follows:

> The same person stopped me just outside the W side of sat 5 and asked me about the flash lights we gave out at the safety stand up and where he could get them. I said the safety store. I kept walking as he was talking and he put his hand out and said something along the lines of "why are you in such a hurry." I tapped my wrist and said I had a meeting to get to. He kept talking and was asking what else the store had and then asked for the number. I said I didn't know but it was up by the front gate. He asked if his steward would have it. . . I said probably or Corie. Then he reached and started touching my gloves and talking about the rubber on them . . . I was really uncomfortable because he kept coming closer to me and was basically backing me up against the West wall of sat 5. I took off my glove and just handed it to him. He started reaching for my other hand and talking about hand warmers . . . and how they would keep my hands warmer than the gloves. . . . I saw a west area operator . . . and when I looked over at him the guy noticed and left.

(*Id.*). On the third occasion, Sedlak stated the URS employee began talking with her about hand warmers again but then walked away when another employee started to approach. (*Id.*).

Sedlak brought these incidents to Feckley's attention, who in turn informed Clink and Brungard. (Doc. No. 35-1 at 4; Doc. No. 36-1 at 2; Doc. No. 37-1 at 4). As was common on the BP jobsite, Sedlak did not know the name of the URS boilermaker. Because each URS employee has a unique hardhat identification number and a separate BP photo identification badge, Clink instructed Feckley to work with Sedlak in identifying the URS boilermaker. (Doc. No. 35-1 at 4; Doc. No. 37-1 at 2).

Feckley and Sedlack went out in the field and Sedlack pointed out the URS boilermaker responsible for harassing her. (Doc. No. 37-1 at 4; Doc. No. 44-1 at 13). They were not able to determine his name at this time because the person's BP identification badge was not visible. (Doc. No. 37-1 at 4). According to Feckley, he pulled up security photos and Sedlak pointed out Zapata as the person who harassed her. (Doc. No. 34-1 at 6; Doc. No. 37-1 at 4). When Feckley attempted

3

to cross-reference the hardhat number with Zapata's photo, they did not match up, i.e., the person Sedlack identified "had a [hardhat] different number [ ] compared to what was in the book." (Doc. No. 37-1 at 7; Doc. No. 34-1 at 6). Feckley went out in the field a second time without Sedlack and confirmed Zapata had the "wrong hardhat number." (Doc. No. 37-1 at 7). Zapata was present for Feckley's deposition. When Feckley was asked if he believed Zapata was the person Sedlack identified in photos and pointed to in the field, Feckley replied, "Yes, sir" and "Yes, I do." (Doc. No. 37-1 at 4). Sedlack, however, testified she no longer believed Zapata was the harasser. (Doc. No. 44-1 at 13).

After the field and photo identifications, Feckley testified he went to Spurgeon to confirm Zapata was the correct person. (Doc. No. 37-1 at 7). According to Feckley, Spurgeon said she did not need to confirm, she was sure it was Philip Zapata.[1] (Doc. No. 37-1 at 7). According to Clink and Spurgeon, Zapata's identity had already been confirmed by photo and field identification. (Doc. No. 35-1 at 4-5; Doc. No. 34-1 at 6). Eventually, Feckley, Clink, and Sedlack met with Brungard and informed him that Sedlak identified Zapata as the person responsible by pointing him out in the field and looking through security photos. (Doc. 36-1 at 3-6).

Brungard determined Zapata's conduct violated the harassment provision of BP's Code of Conduct. (Doc. No. 36-1 at 3). He decided to remove Zapata from the BP Refinery jobsite indefinitely, and instructed Clink to communicate his decision to URS. (Doc. No. 36-1 at 3). Clink relayed this information to Wallace and Zapata was terminated by URS for sexual harassment and driven off the job site. (Doc. No. 35-1 at 5; Doc. No. 34-1 at 5).

Zapata filed a contractual grievance to challenge his discharge, primarily claiming he was mistakenly identified. (Doc. No. 39 at 70). As part of a settlement, Zapata's termination was

---

[1] A female URS employee had similarly accused Zapata of harassment. (Doc. No. 34-1 at 6-7).

4

changed to a lay-off. (*Id.* at 49-50, 98; Doc. No. 40-2). As a result, Zapata continued to work for URS - just not at the BP jobsite. (Doc. No. 39 at 49-50).

Zapata filed an EEOC charge and received a right to sue letter on August 15, 2013. (Doc. No. 1-2). Zapata timely filed suit against URS, Spurgeon, and BP on October 4, 2013, stating claims for race, national origin, and gender discrimination against URS and BP in violation of federal and state law, hostile work environment/sexual harassment against Spurgeon, defamation against all Defendants, and Malicious Third Party Interference against BP. (Doc. No. 1). Zapata subsequently withdrew the gender discrimination claims against URS and Spurgeon, and all discrimination claims against BP. (Doc. No. 44 at 8).

Zapata claims he did not harass Sedlack. (Doc. No. 44 at 2). He believes his co-worker Andy Zapata[2] was responsible because Andy had gotten a flashlight, told him he had a cousin named Marcos Requena, and was the only person at the jobsite to obtain a hardhat not assigned to him. (Doc. No. 39 at 76-77, 92-93). Zapata claims he was discriminated on the basis of race and national origin because Jason Grimes, a white URS boilermaker, had been accused of sexual harassment but was only suspended for a few weeks. (*Id.* at 102-04). As to the defamation claims, Zapata claims "he was falsely accused of sexual harassment and banned for life from BP without reason." (Doc. No. 44 at 3).

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of

---

[2] Andy Zapata, no relation to Plaintiff, was also a boilermaker employed by URS for the BP maintenance project during the events giving rise to this case.

a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "requires the [non-moving] party to go beyond the pleadings" and present some evidence in support of its position. *Celotex*, 477 U.S. at 324; s*ee also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). The non-moving party "need only present evidence from which a jury might return a verdict in his favor" in order to establish a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 257. Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, a court "must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). "At the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**ANALYSIS**

**Race and National Origin Discrimination**

Zapata alleges race and national origin discrimination under both federal and state law – specifically, Title VII and Ohio Rev. Code § 4112.02.  Federal law prohibits employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2.  Ohio Rev. Code § 4112.02 is the state law counterpart to Title VII.  *Oleksiak v. John Carroll University*, No. 84639, 2005 WL 488381, at *4 (Ohio App. Ct. March 3, 2005).  The Ohio Supreme Court has ruled that federal case law interpreting and applying Title VII is applicable to cases involving Ohio Rev. Code 4112.  *Genaro v. Cent. Transport, Inc.*, 703 N.E.2d 782, 784-85 (Ohio 1999).  Accordingly, I will analyze the federal and state law claims using the same standards.

To establish a race or national origin discrimination claim, a plaintiff may employ one of two methods: the direct case or the circumstantial indirect case.  *Oleksiak*, 2005 WL 488381 at *4.  Zapata has offered no direct evidence of disparate treatment, i.e., "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least the motivating factor in the employer's actions."  *Wexler v. White's Fine Furniture, Inc.*, 317 F. 3d 564, 570 (6th Cir. 2003).  Instead, Zapata argues he can establish an indirect, circumstantial case using the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) a similarly situated person outside the protected class was treated more favorably than him under the same circumstances.  *Id.*

Once these elements are established, the burden shifts to the employer to articulate a nondiscriminatory reason for the discharge.  *McDonnell Douglas*, 411 U.S. 792.  If the employer does

7

so, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's proffered reasons are pretextual.  *McConaughy v. Boswell Oil Co.*, 711 N.E.2d 719, 725 (Ohio App. Ct. 1998) (quotations omitted); *see also Frantz v. Beechmont Pet Hosp.*, 690 N.E.2d 897 (Ohio App. Ct. 1996).

Defendant URS does not contest the first and second elements of Zapata's prima facie case. With respect to the third element, the parties disagree as to whether Zapata's successfully grieved termination constitutes an adverse employment action.  To constitute an adverse employment action, a plaintiff must show he has suffered a "materially adverse change in the terms and conditions of his employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004).  A "mere inconvenience or an alteration of job responsibilities" is not enough to constitute an adverse employment action.  *Id.* at 797 (citing *Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 885–87 (6th Cir. 1996)).

The Sixth Circuit has held that suspension of a railroad employee without pay, followed by a reinstatement with back pay thirty-seven days later, was an adverse employment action for Title VII purposes. *White*, 364 F.3d at 802.  The *White* court emphasized the adverse-employment-action element was designed to filter out discrimination cases that cause "merely an inconvenience" or a "bruised ego." *Id.*  The Sixth Circuit concluded not having any income for one month went beyond mere inconvenience.  *Id.*  In this case, however, Zapata's successfully grieved termination did not have a negligible impact on his income, as Zapata was scheduled for a lay-off the same day he was terminated.  *See Plautz v. Potter*, 158 F. App'x 812, 817 (6th Cir. 2005) (holding that plaintiff did not suffer from adverse employment action were her employer withheld one-day's pay, and it was subsequently reinstated).   Moreover, Zapata's employment was not subsequently limited as he continued to work for URS at different jobsites.

8

Zapata also contends the "investigation" itself was an adverse action. (Doc. No. 44 at 13). While there was some confusion as to Zapata's identification, it remains that BP employees investigated the matter (Feckley and Sedlack), concluded Zapata was the harasser (Feckley and Clink), and determined he should be banned from the jobsite (Brungard). While Sedlack no longer believes Zapata was the harasser, Feckley, the BP employee tasked with helping Sedlack identify the harasser, stated Sedlack identified Zapata in the field and in photos, and reported the same to Clink and Brungard. Any issues of fact related to BP's investigation cannot be attributed to URS for discrimination against Zapata by URS. Similarly, BP's ban cannot be attributed to URS as it relates to Zapata's discrimination claims against URS. The proper avenue would be for Zapata to pursue discrimination claims against BP.

Zapata also fails to meet the fourth element of the prima facie case – that similarly situated employees outside of the protected class were treated more favorably under the same circumstances. "[I]n analyzing the treatment of similarly[-]situated employees, the question is whether the plaintiff has demonstrate[d] that he or she is similarly-situated to the non-protected employee in all relevant respects." *Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 772 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008)). But the non-protected employee need not "be identically situated to the plaintiff in every single aspect of their employment." *Id.* Here, Zapata is not similarly situated with Jason Grimes because Zapata was an intermittent, contract employee, while Jason Grimes had worked for URS for many years. (Doc. No. 39 at 103; Doc. No. 34-1 at 9-10). In addition, Grimes was accused of sexual harassment by a URS employee, not a BP employee. Because Grimes accuser was a URS employee, there was no directive by BP to remove Grimes from the jobsite.

9

Zapata has failed to make a prima facie case of disparate treatment because there was no adverse employment action and there was no similarly-situated employee accused of sexual harassment that was treated more favorably.  Accordingly, Zapata's disparate-treatment claims fail.

**Gender Harassment/Hostile Work Environment**

To establish a prima facie case of hostile work environment based on gender harassment, a plaintiff must demonstrate: (1) he belonged to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendant knew or should have known about the harassment and failed to act.  *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 510–13 (6th Cir. 2011).

Zapata claims Spurgeon was "always after him." (Doc. No. 39 at 130).  He alleges eight specific incidents to support his gender harassment claims:

1) Spurgeon asked Zapata "What are you doing here?" and stated "I didn't think you were allowed to work here anymore"  (*Id.* at 134);

2) Spurgeon allowed female employees to ride bikes all over the work area, but on one occasion told Zapata's male co-worker he could not (*Id.* at 131-33);

3) Spurgeon yelled at Zapata while he was in the breakroom, accusing him of using a bicycle in an inappropriate area  (*Id.* at 136; Doc. No. 34-1 at 11-12);

4) Spurgeon allegedly asked Andy Zapata if he was Plaintiff's dad and said Plaintiff needed guidance (Doc. No. 39 at 135);

5) Spurgeon yelled at Zapata and threatened to fire him for borrowing and using a bicycle that did not belong to him in an area where riding bicycles was prohibited (*Id.* at 136-37);

6) Spurgeon allegedly told Zapata's co-worker, Jimmy McCloud, that he had been hanging around Zapata too much because his hardhat numbers were upside down  (*Id.* at 137);

7) Spurgeon accused Zapata for blowing an air horn, despite the fact that he did not think she witnessed the incident (*Id.* at 138);

8) Spurgeon yelled at Zapata for "not signaling" on the golf cart and told another manager Zapata was "driving the golf cart like a maniac"  (*Id.* at 141-42).

While Zapata details incidents in which he felt harassed, he fails to establish the alleged harassment was based on criteria prohibited by Title VII.  None of the incidents described suggest Spurgeon targeted Zapata for harassment because of his gender.  Zapata admits both males and females were treated more favorably by being allowed to use the maintenance bathroom.  (Doc. No. 39 at 140-41).  Moreover, Zapata admits that he "[didn't] know if [Spurgeon's behavior was] based on [his] gender or if [Spurgeon] just had it out for [him]."  (*Id.* at 134).

Instead, Zapata appears to be claiming he was subjected to general harassment by Spurgeon.  While Zapata may feel this harassment created a hostile work environment, these actions are only a violation of federal law if the harassment is based on criteria prohibited by Title VII or another federal statute.  The actions Zapata details in his complaint, accepted as true and construed in his favor, do not support a federal cause of action.

**Defamation**

In order to state a claim for defamation, a plaintiff must prove (1) a false statement; (2) unprivileged publication to a third party; (3) "fault amounting at least to negligence on the part of the publisher"; and (4) actionability or special harm caused by the statement.  *Dailey v. Accubuilt, Inc.*, 944 F. Supp. 2d 571, 584-85 (N.D. Ohio 2013) (quoting *Smith v. Bd. of Trustees Lakeland Cmty. College,* 746 F.Supp.2d 877, 903 (N.D.Ohio 2010)).

Zapata argues "there are questions of fact over the sexual harassment allegations made against [him]."  (Doc. No. 44 at 15).  And "there was not an adequate investigation into the false statements asserted, the statements were not privileged, and even if they were, they exceed the scope of its privilege."  (*Id.*).

Zapata asks me to collectively characterize any and all sexual harassment allegations as false statements against him.  But a plaintiff's failure to identify a false statement of fact prevents a reasonable jury from concluding a defendant is liable for defamation.  *See Voyticky v. Village of*

11

*Timberlake, Ohio*, 412 F.3d 669, 678 (6th Cir. 2005) (applying Ohio law and affirming summary judgment when the plaintiff "failed to place in the record any statements that Defendants published, much less any published statements that were false."); *see also Dailey*, 944 F. Supp. 2d at 584-85. Relevant here, it was true Zapata was accused of sexual harassment by a BP employee.  In any event, both Defendants URS and BP claim their communications regarding the sexual harassment allegations lodged against Zapata were subject to qualified privilege.

In Ohio, the qualified privilege doctrine applies to communications made in connection with sexual harassment complaints, *Bisbee v. Cuyahoga Cnty. Bd. of Elections*, 2001 WL 204174, at *5-6 (Ohio App. Ct. 2001), and where two entities share a mutual business interest even if the entities are not related – other than having a common business interest – or the person making the statement and the recipient of the statement do not have the same employer.  *Gaumont v. Emery Air Freight Corp.*, 572 N.E.2d 747, 755 (Ohio App. Ct. 1989).  Thus, the qualified privilege applies to both Defendants.

While protected by a qualified privilege, defamatory statements will impose liability only when the defamation was published to someone not within the scope of the privilege, or if the defamation was published to individuals within the scope of the privilege but with actual malice. *Gray v. Allison Division, General Motors Corp.*, 370 N.E.2d 747, 751 (Ohio App. Ct. 1977).  Concerning scope, any statements made in the course of a grievance procedure are privileged.  *Id.*  ("By virtue of appellee's union membership and his voluntary participation in the grievance procedure, qualified privilege is properly invoked.").  In a qualified privilege case, "actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.  *Jackson v. City of Columbus*,  883 N.E.2d 1060, 1064 (Ohio 2008).  The phrase "reckless disregard" applies when the publisher of defamatory statements acts with "a high degree of awareness of their probable falsity" or when the publisher in fact entertained serious doubts as to

12

the truth of his publication. *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74(1964)); *see also Green v. Fidelity Invs.,* 374 F. App'x. 573, 578 (6th Cir. 2010).

Zapata appears to agree the qualified privilege doctrine applies but argues the parties exceeded its scope by acting with actual malice. Zapata spends a significant amount of time attempting to single out Spurgeon as the person responsible for identifying Zapata. Viewing the facts in a light most favorable to Zapata, however, it remains that BP employees investigated the matter (Feckley and Sedlack), concluded Zapata was the harasser (Feckley and Clink), and determined he should be banned from the jobsite (Brungard). While Sedlack no longer believes Zapata was the harasser, Feckley, the BP employee tasked with helping Sedlack identify the harasser, stated Sedlack identified Zapata in the field and in photos. Dispositive here, Zapata testified he had no basis to believe any of the BP individuals (Sedlack, Clink, Brungard, or Feckley) involved in the sexual harassment investigation harbored any malice or ill-will toward him, or had any reason to fabricate or knowingly disseminate false information about him. (Doc. No. 39 at 58-59, 96, 116, 122-23). Similarly, there was no reason for URS to doubt the veracity of BP's investigation when it decided to ban Zapata from the BP jobsite. Accordingly, Zapata's defamation claims fail.

**<u>Malicious Interference</u>**

Zapata's "malicious third party interference with contact" claim is directed solely toward Defendant BP. The contract allegedly interfered with is the collective bargaining agreement between Zapata's union, Local 85, and URS. According to the complaint, the act of interference by BP was "participat[ing] with Defendant URS in utilizing false information and defamatory remarks pertaining to Plaintiff" and then barring Zapata from the BP jobsite. (Doc. No. 1 at 9).

In his opposition, Zapata acknowledges this claim is subject to the same qualified privilege defense as the defamation claim. (Doc. No. 44 at 23). Indeed, when a privilege, qualified or absolute, attaches to statements based on a defamation claim, those statements remain privileged for

13

the purpose of any derivative claims such as tortious interference with a business relationship. *A& B Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council*, 651 N.E.2d 1283, 1295 (1995) ("where claims such as tortious interference and disparagement are based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements . . . must also apply in the derivative claims). Accordingly, Zapata's malicious interference claim against Defendant BP is dismissed.

## CONCLUSION

For the reasons stated above, Defendants Spurgeon and URS's motion for summary judgment is granted (Doc. No. 40), and Defendant BP's motion for summary judgment is granted (Doc. No. 41).

So Ordered.

  s/ *Jeffrey J. Helmick*
United States District Judge
